If it pleases the Court, Your Honor, Mark Seltzer on behalf of the plaintiffs' appellants in this case, and I would like to reserve some time for rebuttal. Okay. Please watch the clock. In this case, plaintiffs allege that pursuant to interconnected agreements, the NFL agreed, and these are the teams, agreed among themselves, acting through the NFL as the instrumentality of the teams, to make DIRECTV their exclusive joint-selling agent of all out-of-market games as part of the Sunday ticket package, and further agreed not to compete with DIRECTV in selling their own broadcasts of those games. Under subtle law, this kind of arrangement can be found to violate the antitrust laws as a naked restraint of competition. Can you help me with the question that seems to me at the heart of this? The district court understood that there could not be any telecasts at all without agreements among various owners of intellectual property, and as a result, there had to be coordination in order to have telecasts at all, so the court was skeptical of antitrust violation. Where does the law stand on that? On that point, Your Honor, the law is very clear. Each team individually owns its own rights to broadcast its own games. That's been the case forever, and we've demonstrated that that was not just what the courts have said. The NFL conceded that point when they were sued by the government for engaging in a similar kind of restraint to restrict the broadcasts of games that would be competing with other broadcasts. So to the extent a team is the author of a game, I mean, the authorship doesn't quite map over football games, would include both teams, and there are intellectual properties such as NFL logos, the logos of the individual teams. How does that affect that sort of analysis? Your Honor has put your finger on an absolutely critical point. The teams each own the right to broadcast their own games, whether it involves an NFL logo or anything else. That's the law. That's what the court said in the NFL decisions, and that was the whole premise of the case Shaw v. Dallas Cowboys and the Lowman case that dealt with this issue. Each team owns those rights. Before the NFL teams started to agree among themselves to restrain competition a long time ago, what would happen is that the team that had the home game would make a deal with the visiting team to allow the visiting team to broadcast that game, and they would do that under reciprocal arrangement just for those two teams. It didn't involve the NFL. There wasn't any question of intellectual property rights of the NFL or any other teams, but if they had chosen not to do that, to enter into those reciprocal agreements, then each team would retain its own broadcast rights, and that would be the game that could be broadcast. The NFL never owned those rights. The only reason the NFL has those rights now is because they entered into a horizontal agreement among these independent teams to cede those rights to the NFL so the NFL, acting as their instrumentality, could make a deal with DirecTV. The fundamental flaw of the court's decision, among several others, for example, engaging in fact-finding in this highly fact-intensive situation dealing with issues like the measure of output, which is a fact-intensive question, the court assumed going in and analyzing these contracts that the NFL had ownership rights in the broadcast of these games. That's why it relied upon a case like Washington or Spinelli where there wasn't an issue as to whether or not the NFL owned the rights in question. Here, the NFL never owned the rights. The only reason they owned the rights was because of this horizontal agreement, and that's a point that the district court really missed, and it's fundamental because if you look at NCAA, same idea. Each team owns its broadcast rights, and what happened is that through the rulemaking process where the institutions all participated, which made it a horizontal agreement, they restricted the right of teams to engage separately to contract to broadcast their games. It could only be done through games authorized by the NCAA, and the NCAA strictly limited the games that could be broadcast. That was held to be illegal by the U.S. Supreme Court. Why? Because the individual team members were precluded from competing against this bundle that was created when they gave broadcast rights to the NCAA. And what happened after NCAA? There was a complete explosion of games that became available. Now, on any Saturday, you can see 40 games often competing with each other at the same time on multiple channels. Take an example of why the so-called cooperation that the court assumed was necessary to enable these games to be broadcast. If you look at college right now, when Michigan opened its season against Notre Dame, that was a game that was broadcast, pursuant to a contract that Notre Dame individually negotiated with, I think it was CBS, if I recall correctly. That couldn't have happened under NCAA, and you couldn't have had the explosion of games available if NCAA had not decided that that was illegal. The whole concept was following the American Moodle as well. The teams have their individual intellectual property rights. In American Moodle, they ceded those to the NFL in order to create a bundle of all of the logos, all the team colors could be bought as one product. But what happened? Pursuant to that agreement, the teams agreed not to compete against that bundle. The teams argued and the NFL argued, well, we've created a new product, this NFL logo product. But that didn't excuse the fact that they can't agree among themselves not to compete against that product. And that's exactly what the teams have done here with DirecTV. They've agreed horizontally to give the rights exclusively to DirecTV and then agree not to broadcast games in competition with that bundle. That's the antitrust violation, and that's what's enabled DirecTV to raise prices to super competitive levels. They charge $300, $400 for a subscriber for this package. It's way out of line with the cost of buying other sports channels, and it's much different than the practices of all of the other professional sports, baseball, hockey, whatever. That's a unique agreement here, which the court again misunderstood by assuming that the case should be analyzed as if the NFL owned these rights in the first instance. And so what it did is it sliced and diced the case, analyzing the horizontal agreement separately, and saying, well, that's okay, all we've done is agreed to grant rights to the NFL. And by the way, I think the analysis there is incorrect, but be that as it may, the court analyzed that separately and said assuming that's already happened and it's completely lawful, now we turn to the deal with DirecTV and whether or not an exclusive arrangement between the NFL and DirecTV would be lawful, ignoring the fact that these agreements all work together. They're integrated in the sense that under the terms of the deal between the NFL and DirecTV, the teams can't compete with DirecTV. That's by express agreement. And the teams also agree that they're not going to offer any games on their own that would be competitive with DirecTV. That is almost exactly the same fact pattern that the Supreme Court said was illegal in NCAA and which the Supreme Court held was illegal in American Needle, where you have essentially a joint venture being formed with the teams and saying we're going to market exclusively through the NFL, not individually, even though the teams themselves have their own property rights to their own logos and their own colors. Let me change the emphasis just a little bit. Sure. It seems that what you're doing is you're challenging this horizontal agreement between the NFL teams based on a pass-on theory of injury. That deals with the only brick question, Your Honor. I know, because you allege, and I'm just talking about your allegation, because of the reduced competition in the broadcasting and sale of live video presentations of professional football games, ESPN and NFL Network are able to charge inordinately large subscription fees to MVPDs, which are then passed on to consumers. So it seems like you're really alleging a pass-on theory. Do you ever allege that the NFL teams conspired to set an actual price paid by the consumers? No, we don't, Your Honor. And the reason why a pass-on theory doesn't really apply here is that you don't ever allege that they set the actual price. No, we don't, Your Honor. If they don't set the actual price, then why should your damages claim be successful? Let me respond to that as directly as I can, Your Honor. This case is not a case where you have a price fixed by an intermediary in the chain of distribution. It is the intermediary who's setting the price. No, here, actually, it's the company that's dealing with the subscriber. DirecTV is setting the price. Well, that's the intermediary. It's not the intermediary. It's the direct seller to the plaintiffs. Let me explain, if I can, Your Honor. The theory of the case is that you have DirecTV being granted these exclusive rights with the teams agreeing not to compete against DirecTV. Effectively, a cartel is using a joint selling agent, DirecTV, to sell the broadcasts. If the agreement had not been reached, you would have those companies, those teams, directly competing with DirecTV at the same level of distribution. Are you talking about there would be multiple telecasts? I know that was one of the arguments. You said each team could have their own telecast. Yes, yes. Each team, if each team could, and they did before these restraints were ever imposed in the first place, agreed to contracts with the television broadcast companies to broadcast their games, and they could broadcast them not just locally but nationally. But now they've taken all that ability to have those broadcasts, and they've, as I understand it, coupled with the agreement with DirecTV, they've pooled those agreements, given them all to the NFL, coupled with the agreement as to DirecTV, they have then got this anti-competitive behavior, which you now challenge. My worry is that if I look at our case of in-ray ATM fee antitrust litigation, I see an intermediary who is the one who's setting the prices. I don't see the NFL players, NFL teams, setting the prices at all. And if I look at antitrust, ATM fee antitrust, it's absolutely clear under our law, if you don't allege that they conspire to set the actual price paid by the consumer, then you have no relief for damages. The only relief you have is injunctive relief. Your Honor, let me see if I can dispel that issue. In ATM, what happened is you had banks that agreed to fix what was called the interchange fee. In ATM, so I know what they did. I know, Your Honor, and I've read that decision I don't know how many times. I know about that decision. Right. So you don't need to explain what happened there. I'm trying to figure out why this is any different. Because this is not a case where we're saying that the NFL teams overcharge DirecTV and DirecTV passed on that overcharge to the plaintiffs. That's the fact pattern in ATM. Our case doesn't depend upon showing that there was an overcharge at the MPVDB level, which was then passed on to the plaintiffs. Instead, the idea is that the restriction on output by this exclusive agreement where the teams agree not to compete against MTV enables. It's an output contract. It's not necessarily a price situation. It's an output situation. I understand that. But I'm still trying to figure out how I get around this, get to that point. Think about it this way, Your Honor, just to simplify it. Suppose you had two competitors both selling competing products, and one competitor agreed with the other competitor not to compete with the second competitor, and only the first one could sell the product, which enabled the one that could sell the product to raise prices because there was an output restriction by virtue of the other one leaving the marketplace. That's this case. That is not a pass-on case. It's a case where you've got effectively a horizontal restriction of output that enables prices to be raised. And an output restriction is just the flip side of the same coin as a price restraint. That's what the law says. I see I'm running short of time. I would like to reserve some time for rebuttal, Your Honor. I have a few seconds. Good morning. May it please the Court. The district court correctly held that plaintiffs had failed to state a cause of action in two respects. First, it failed to allege a plausible relevant market in which defendants have and can exercise market power. Doesn't NFL have 100 percent of the market? I mean, by virtue of these agreements and the like, NFL is the only one who has these. I'm informed because I don't watch it myself. But I'm informed that they have 100 percent of the market and there isn't a substitute unless you like hockey. Well, Your Honor, the first step in the analysis is to try to identify a plausible relevant market for antitrust purposes. Well, isn't there a national market for football games and they own the entire market? Your Honor, the NFL is at the moment the only professional football league. Right. So they have 100 percent of the market nationwide, I'm informed. But the character of this relevant market is very important. And there's a side light that bears emphasis here at the outset. Every NFL game is broadcast on free over-the-air television. So they have limited so NFL in control of the market has limited showings in local markets per its agreement. How does that change the analysis because they own 100 percent? I mean, presumably they could decide not to show it in the local markets also. Because there's nothing unlawful about owning 100 percent. Let me just indulge that assumption for a moment. But you were saying they were having problems with identifying a market and I was informed that they owned 100 percent of it. No, but in terms of for the purposes of the antitrust analysis, it's essential that plaintiffs show that the NFL has and can exercise market power in the relevant market. And it can, right? How can that be disputed? It can be disputed here because the NFL makes. They choose not to do it? Because the NFL. Because they choose not to use it or why? It's because the NFL makes available for free at least three games every weekend on free over-the-air television. And then if the NFL, or in this case, direct TV, tried to raise the cost for broadcasting the out-of-market games, and that's what this dispute is about, the out-of-market games, then the consumer would substitute the free game for an out-of-market game and there would be no ability to exercise market power. Can I ask you the question I started with opposing counsel, which is the district court seemed to think that there had to be agreements among the teams in NFL because of the nature of the product that was being telecast, but cited no law supporting that. And so I'm curious about what is the legal framework for that conclusion? The district court was absolutely correct. Two cases that bear on the issue you're on are Spinelli and Washington. Well, I read the Second Circuit case that was circulated and it didn't provide any legal underpinning for this assumption. So what's the legal underpinning? The district court in Spinelli and the district court in the Washington case both provided a legal framework recognizing that any broadcast includes the intellectual property of two clubs at the very least. So if it's a copyright, if you're talking about a copyright, then as joint authors, then either one can produce, can telecast and just has to share proceeds. So there's no legal bar to either team or both teams going off to sell their telecasts. So is that what you're talking about, a joint authorship situation? The game is the property of both teams, the NFL and also the networks. And so I don't understand NFL. I understand the networks are telecasting it, but I'm trying to understand the copyright violation here so that somebody could bar a team from hiring some network or some outfit to telecast the game and then sell that telecast in whatever medium they wanted, provided they share proceeds with the other team. So help me understand why that's not correct. Let me back up and start with the games themselves. The games are produced. There's a contract with the networks. Well, but there doesn't have to be, right? So each team could contract with their own producers, right? I think that – That used to happen, correct? Some of the old cases say that. Some of the old cases, yes. And then in 1961 – Why not? In 1961, the Congress passed the Sports Broadcasting Act, which created an antitrust exemption. So there's an exemption, but there's no bar on hiring whatever production company you want to go produce your game. But under the framework of the Sports Broadcasting Act, which provides immunity from antitrust scrutiny, the NFL teams opted to contract with two – in this case with two networks, Fox and CBS, to produce the games. I'm just looking at what the legal bar is, what the legal bar would be from producing as many telecasts as they wanted of the game. Well, at this point, there's a contractual bar. That's fine. But that's what's being challenged here, which is that some of these contracts are part of a conspiracy. But that contract, Your Honor, is subject to the Sports Broadcasting Act. The agreement among the clubs to pool their rights and to sell them to the networks, Fox and CBS, is protected by the Sports Broadcasting Act. There's no question about that. What happens next is that the networks add in their camera angles, their commentary, and the rest, and they generate a game feed. And that game feed is the product of the two clubs who participate, the NFL, whose marks and logos are also reflected in the game. So are you talking about a trademark violation?  It's both copyright and trademark rights. Would that be confusing if it was because there wouldn't be a trademark violation unless it was confusing to the public? I'm sorry. I have not been clear. But what is NFL's ownership interest in the copyright? The NFL owns the game. That's by contract, right? It's not by a matter of law. Yes. It's by contract. Yes. Okay. And so that's the contract that they're challenging, right? They are challenging the contract between the NFL and DirecTV. And the teams. The exclusive dealings. And the NFL and the teams. Well, no, at that point, Your Honor, by the time... Aren't they challenging that? I thought that was the other... They have challenged the underlying agreement. The NFL teams contract. Forgive me. I shouldn't talk over you, Your Honor. They are challenging the underlying agreement between the clubs to license CBS and Fox to produce the games. That is protected by the Sports Broadcasting Act. They are also challenging the vertical agreement by which the NFL, which ends up being the owner of the broadcast, as we see in the copyright notices referenced in our brief, they are challenging the NFL's agreement with DirecTV... And they aren't challenging the team's agreement with the NFL? Is that your position? If they are challenging the team's agreement with the NFL, that agreement is protected by the Sports Broadcasting Act, Your Honor. It's clear as day. I thought you weren't arguing that SBA was limited to the sponsored telecasts, right? We are not arguing that the SBA protects the NFL's agreement with DirecTV, that exclusive agreement. And so didn't the team say that the NFL would have the exclusive right to market the telecasts? I thought that was part of it. And you're saying that's protected by the SBA? The NFL is vested with ownership of the game feeds as a result of contracts that are protected by the Sports Broadcasting Act. The transaction with DirecTV is between the NFL or an NFL-related entity and DirecTV. The clubs are not parties to that agreement. But they agreed to let NFL market those feeds, those telecasts, which otherwise... And do they agree that they won't go out and do their own telecasts and won't compete? Or is that not part of the agreement? That is part of the agreement. Your Honor, I was going to focus my argument today on the relevant market issue because I think it's the easiest and most straightforward means for this Court to affirm the District Court below. Now, appellants presented two proposed relevant markets, one made up of all live video presentations of regular season games, which of course includes the games available for free, and one limited to the live broadcasts of out-of-market games, which excludes the games available for free. And the governing legal principle isn't in dispute. A properly defined relevant market must include all products that enjoy reasonable interchangeability of use and cross-elasticity of demand. In other words, reasonable substitutability. Appellants' first relevant market allegation assumes that every NFL game is a reasonable substitute for every other NFL game. If that premise is true, the availability of free in-market games, the three free games that I mentioned earlier, would prevent anti-competitive pricing for broadcasts of out-of-market games. If DirecTV attempted to raise the price of out-of-market games above competitive levels, consumers would simply substitute one of the free in-market games in their place. That would discipline the market and preclude any exercise of market power. Appellants' second proposed market, out-of-market games only, is gerrymandered to avoid that result. It assumes that in-market games do not and could not compete with out-of-market games. That illogical assumption, for which appellants offer not a scintilla of factual support, is simply implausible. If a consumer is interested in one and only one NFL game, if she's interested only in the games of the Green Bay Packers, for example, then a market consisting of all out-of-market games makes no sense. No other game, in-market or out-of-market, would be a substitute for the game that she wants to watch. Similarly, the preferences of a consumer interested in choosing among NFL games cannot support a market limited only to out-of-market games. The options for such a consumer include both in-market games and out-of-market games. That's true whether she chooses among games on the basis of price or the quality of the matchup or on the basis of the lineup for her fantasy football team. In Los Angeles, on a typical Sunday afternoon, three in-market games are available for free and nine additional games are available from DirecTV on Sunday ticket. It would be absurd to assume that for any fan in Los Angeles interested in choosing among NFL games, one or more of the three free in-market games would not be a reasonable substitute for one or more of the nine out-of-market games, and vice versa. Accordingly, a relevant market that includes multiple out-of-market games but not a single in-market game is entirely implausible. If there were any question about that, it would be resolved by the claims of the appellant sports bars here. The sports bars seek to attract customers by showing a full range of NFL games both in-market and out-of-market. The proposed relevant market definitions don't fit those plaintiffs either. Let me turn now, if I may, to the anti-competitive effects issues. And this goes to some of the issues that Your Honor was addressing at the start of my argument. Appellants alleged that NFL Sunday ticket unreasonably restrained competition, and there were two parts to their allegations. The first part was there was a challenge to a horizontal agreement. The second challenge was a challenge to the vertical agreement, the agreement between the NFL and DirecTV. The district court properly rejected both elements of this challenge. However, if we look at NCAA, it seems to me that they had a similar type, if you will, allegations that they were suggesting in NCAA versus the Board of Regents of Oklahoma. And even though there were two or three agreements in that particular situation, the Supreme Court reviewed the situation of the plan as a whole and evaluated the situation, which is what your opponent has asked us to do in this particular situation. I understand that one can take those two different markets and work them down, but it seems to me that one has to look at what is the, after all, the final, if you will, the overall plan, the overall scheme. So tell me why this isn't like the NCAA case. Well, it's not like the NCAA case in several respects, the most important of which is that NCAA imposed, involved the imposition of a naked restraint, a limitation on the number of games that could be broadcast. There's nothing like that here. Here, every NFL game is broadcast for free on over-the-air television, every game. Every consumer has access to multiple games. NCAA had nothing to do, the NCAA itself had nothing to do with the distribution of games or... Let me back out. Didn't, in the NCAA, as similar in this case, don't the teams agree to consolidate their broadcast rights into a single joint entity, NFL? Here, the... They all do that. Then the NFL enters into an agreement with CBS, Fox, NBC, or whoever, and doing what they have to do. So then it seems to me there is a similar situation with NCAA. Well, Your Honor, I disagree for two reasons. Several reasons. First is the Sports Broadcasting Act applies to the NFL and not to the NCAA. The second is the NCAA is not a league, it's not a conference. The lines that were drawn and the restrictions and restraints that were imposed in NCAA went across conference and league boundaries. And third, NCAA didn't involve an alleged vertical restraint of the kind that's issued here and which is presumptively pro-competitive. But the key point is that the NCAA case involved naked restraints in contrast to here where there is full output, every game is broadcast and every game is broadcast for free and is accessible to consumers for free under the definition of output that the court adopted in NCAA, which the district court adopted here. Every game is broadcast, output is full, and under those circumstances, the notion that there's been some diminution of competition has to be rejected. I mean, the index of a restraint of trade is a reduction of output. That's what NCAA did by limiting the number. Well, there's fewer telecasts, right? So the argument that's made by opposing counsel is that only one telecast is made of each game, whereas in the olden time there could be multiple both teams or even more than that. Well, it's true that there's only one broadcast of each game, but what plaintiffs here are complaining about is simply that they may not be able to see for free the game that they most prefer to see for free. But their game, the game that they want to watch, is available for free, it's broadcast for free, as is every other game in contrast to NCAA. Thank you for your argument. We'll give you a minute because we took... Thank you, Your Honor. First of all, on the SBA, the SBA wouldn't have been needed if the teams didn't own the rights and if their agreement among themselves to limit broadcast rights would be a violation of the antitrust laws. It immunizes what would otherwise be a violation of the antitrust laws. NFL 1, NFL 2 clearly established the teams own the rights, not the NFL. And as was conceded, by contract is the only reason they have those rights. On the market definition, Your Honor, there's a difference in antitrust law between having a market that's composed of substitutes that are perfect substitutes and ones that are imperfect substitutes. Markets are differentiated, that's why submarkets exist. All markets don't have to contain perfect substitutes, that's what we've alleged here. And our market definition is almost exactly the same as was used in NCAA. With respect to the question on output restriction, let's suppose that I wanted to see, I'm a Detroit Lions fan, and I want to see this Sunday's game with the Cardinals. The only way I can see that is to buy a DirecTV subscription and pay $350 or $400 to DirecTV or move to Arizona. That's an output restriction, it restricts the games available to be seen, and that's also a naked restraint. And by the way, if pro-competitive justifications aren't offered, they're not being offered now by the defendants in support of these restraints, market definition isn't even required. That's what the Supreme Court said in NCAA and in Indiana Dennis. This is a restraint that directly reduces the output of games that could be seen by people across the United States. As the amici pointed out, if you accepted their argument at face value, if you broadcast all the games only in South Dakota or North Dakota so they're available someplace to be seen in a town with only 70,000 people, there would be no problem under the antitrust laws. I think we have your argument over your time. Thank you. Thank you, Your Honor.
judges: Ikuta, N.R. Smith, Steeh